People v National Rifle Assn. of Am. (2023 NY Slip Op 06819)

People v National Rifle Assn. of Am.

2023 NY Slip Op 06819

Decided on December 28, 2023

Appellate Division, First Department

Scarpulla, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: December 28, 2023
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels
Jeffrey K. Oing Saliann Scarpulla Julio Rodriguez III John R. Higgitt

Index No. 451625/20 Appeal No. 1026-28 Case No. 2022-03159, 2022-05187, 2023-00156 

[*1]People of the State of New York etc., Plaintiff-Respondent,
v
The National Rifle Association of America, Defendant-Appellant, Wayne Lapierre et al., Defendants.

Defendant The National Rifle Association of America appeals from the order of the Supreme Court, New York County (Joel M. Cohen, J.), entered June 10, 2022, which granted the NYAG's motion to dismiss its First Amendment retaliation and selective enforcement counterclaims.

Brewer, Attorneys & Counselors, New York (Noah Peters, William A. Brewer III, and Joshua M. Dillion of counsel), for appellant.
Letitia James, Attorney General, New York (Judith N. Vale, Matthew W. Grieco, Philip J. Levitz and Barbara D. Underwood of counsel), for respondent.

Scarpulla, J. 

This appeal arises from a suit commenced by plaintiff People of the State of New York, by Attorney General Letitia James (NYAG), in August 2020, against defendant The National Rifle Association of America (NRA), a New York-domiciled not-for-profit corporation, and four of its executives and directors — Wayne LaPierre, Wilson Phillips, John Frazier, and Joshua Powell. NYAG's second amended complaint extensively details, among other things, widespread and longstanding executive malfeasance. For example, the complaint alleges that the NRA regularly paid for enormous expenses incurred by LaPierre and his family members for personal travel to the Bahamas, often via private jet, and to other destinations. The NYAG alleges that the NRA utilized a pass-through arrangement whereby millions of dollars in entertainment and travel expenses incurred by NRA executives were billed to the NRA as purported disbursements paid to the advertising firm Ackerman McQueen for advertising and public relations services. This arrangement allegedly allowed the NRA to evade its own accounting and expense-reimbursement procedures, as well as IRS requirements.
Additionally, defendants and other NRA officers and directors failed properly to disclose alleged conflicts of interest and related party transactions to the NRA's Board of Directors, and failed to secure the Board's approval for those conflicts and transactions. In one instance, the NYAG alleges that the NRA paid $1.4 million to an information technology company, HomeTelos, whose chief executive had a longstanding personal relationship with Phillips. Another alleged unlawful related party transaction involved a highly lucrative agreement between the NRA and LaPierre wherein the former guaranteed the latter income for years after he leaves the NRA at a rate exceeding his employee compensation, enabling LaPierre to retain influence over the NRA even if he were removed from office.
Another type of malfeasance alleged in the complaint is that the NRA and the individual defendants retaliated against whistleblowers who attempted to raise concerns about financial misconduct within the NRA. Also, according to the complaint, between 2015 and 2019, the NRA, LaPierre, Phillips, and Frazer made materially false and misleading statements and omissions in the NRA's yearly CHAR500 filing with the NYAG. Based on its investigation, the NYAG asserted claims against defendants [*2]for violations of provisions applicable to not-for-profit charitable corporations under the Estates, Powers and Trusts Law, the Not-for-Profit Corporation Law, and the Executive Law.
As relevant here, the NRA asserted counterclaims against the NYAG for First Amendment retaliation and selective enforcement. Specifically, the NRA alleged that while the NYAG was campaigning for her current position, she displayed animus towards the NRA by promising to "take down the NRA" using her power as attorney general to regulate charities. James allegedly called the NRA a "terrorist organization" and "criminal enterprise." The NRA further alleged that the NYAG, rather than working with the NRA to fix issues, as it has done in other cases involving not-for-profit corporations, instead sought dissolution, an extreme remedy not frequently pursued by the NYAG.
The NYAG moved to dismiss the NRA's counterclaims, and the motion court granted the motion. With respect to the First Amendment retaliation counterclaims, the court found that these claims lacked the necessary causal element. The motion court dismissed the selective enforcement counterclaims on the ground that: 1) the NRA failed to allege that it received different treatment than "similarly situated charitable organizations" based on inappropriate considerations; and 2) the NYAG demonstrated that it previously sought dissolution against other charities and that the NRA was not the only organization against which this remedy was sought. Lastly, the court held that, on account of its earlier decision and order which dismissed the NYAG's dissolution claims, "to the extent the counterclaims seek declaratory and injunctive relief stemming from the dissolution claims, those claims are moot." This appeal ensued.
As an initial matter, two types of relief sought by the NRA in its counterclaims need not be addressed on this appeal. First, it is undisputed that the counterclaims' money damages demands were abandoned on appeal. Second, the portion of the NRA's counterclaims that seek declaratory and injunctive relief in connection with the NYAG's dissolution claims are moot. This category of the demand for declaratory and injunctive relief was mooted, as the motion court properly determined, by that court's prior dismissal of the NYAG's dissolution claims.[FN1]
 Nevertheless, we address the counterclaims to the extent that the NRA seeks relief other than money damages or a declaration/injunction prohibiting dissolution.
In four of its counterclaims, the NRA alleges First Amendment retaliation. Under the First Amendment, government officials are prohibited from retaliating against those who are engaging in protected speech (Hartman v Moore, 547 US 250, 256 [2006]). Government agencies, however, are presumed to act in good faith in their pursuit of investigations, prosecutions, and enforcement proceedings for alleged misconduct (see id. at 263). To state a claim for First Amendment retaliation, a plaintiff must allege (1[*3]) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action (Dolan v Connolly, 794 F3d 290, 294 [2d Cir 2015][internal quotation marks omitted]). On this appeal, the only element of the NRA's retaliation counterclaims at issue is causation, and the parties dispute what must be pleaded to support those counterclaims.
The NYAG asserts, and the motion court found, that the "no probable cause" causation standard articulated in Hartman v Moore (547 US at 259-266) and Nieves v Bartlett (587 US &mdash, &mdash, 139 S Ct 1715, 1721-1725 [2019]) is the appropriate standard under which to view the NYAG's conduct. In Hartman, the United States Supreme Court held that, in the retaliatory prosecution context, a plaintiff must plead and prove "the absence of probable cause" for the prosecution (Hartman, 547 US at 265-266). The Supreme Court reasoned that, "[d]emonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution, while establishing the existence of probable cause will suggest that prosecution would have occurred even without a retaliatory motive" (id. at 261).
In Nieves, the United States Supreme Court held that because retaliatory arrest claims contain the same causal complexities as those noted in Hartman, the no probable cause standard should apply in the context of retaliatory arrest cases as well (Nieves, 139 S Ct at 1723-1725). Although Hartman and Nieves both involved claims for money damages, their holdings were not limited to such claims.
The NRA, in contrast, argues that the appropriate causation standard to be applied to First Amendment retaliation claims is the burden-shifting framework articulated in Mt. Healthy City Sch. Dist. Bd. of Educ. v Doyle (429 US 274, 287 [1977]). Under this standard, a plaintiff must first show that retaliation was a "substantial" or "motivating factor" underlying the decision at issue (id. at 287). Then, the burden shifts to the defendant to show the decision would have been made even absent any protected conduct (id.). The NRA further argues that the no probable cause standard is inapplicable and whether the NYAG had probable cause to commence this action is "irrelevant at this stage."
On this issue of first impression, we hold that the proper legal standard applicable to First Amendment retaliation claims in civil enforcement proceedings such as this one is the no probable cause standard articulated in Hartman and Nieves (see generally DeMartini v Town of Gulf Stream, 942 F3d 1277, 1304-1306 [11th Cir 2019], cert denied — US &mdash, 141 S Ct 660 [2020]; McBeth v Himes, 598 F3d 708, 717-720 [10th Cir 2010]). Civil enforcement proceedings involve many of the same factors considered by the Supreme Court when it adopted the no probable [*4]cause standard applicable to alleged retaliatory criminal prosecutions and arrests. These factors include: the involvement of legal counsel whose decisions are subject to a presumption of regularity; sometimes multiple decisionmakers; a complex chain of causation involving investigation, recommendation, and filing of an enforcement proceeding; and the universal availability of probable cause evidence (see Nieves, 139 S Ct at 1723-1725; Hartman, 547 US at 259-265; DeMartini, 942 F3d at 1304-1306; McBeth, 598 F3d at 717-720; see also Altamore v Barrios-Paoli, 90 NY2d 378, 386 [1997]; Matter of American Dental Coop. v Attorney General of the State of NY, 127 AD2d 274, 280 [1st Dept 1987][presumption of regularity and good faith attaching to official acts, including issuance of investigatory subpoenas]).
Applying the no probable cause standard here, theNRA's First Amendment retaliation counterclaims were properly dismissed for lack of causation (see generally Dolan, 794 F3d at 294). That is, the NYAG showed as a matter of law that it had probable cause to investigate and sue the NRA (see Nieves, 139 S Ct at 1726 [holding that the "presence of probable cause should generally defeat a First Amendment retaliatory [] claim"]). First, the NYAG has statutory authority to enforce New York's charities laws (see N-PCL 706[d], 715[f], 1101[a]; EPTL 8-1.4[i], [m]). Second, public reports of malfeasance at the NRA predated the investigation, and other indicators of malfeasance surfaced after the investigation was opened. Third, the NYAG's own investigation uncovered ample evidence of malfeasance, as evidenced by the lengthy, detailed complaint.
Tellingly, the NRA does not affirmatively argue that the NYAG lacked probable cause for this enforcement action. Instead, it simply posits that the no probable cause standard is the incorrect one. In a footnote, the NRA states that even if the Hartman and Nieves standard applied, the NRA's counterclaims are sufficient because it pleaded "that the NYAG did not seek dissolution against [other] entities that were victims of similar alleged conduct by executives." This argument merely restates the NRA's personal animus and selective enforcement argument and does not illustrate an absence of probable cause.[FN2]

Further, contrary to the NRA's assertion, Hartman and Nieves did not draw a distinction between cases involving direct and indirect evidence of retaliatory animus. In fact, Hartman specifically declined to do so (see 547 US at 264-266, 264 n 10).
Finally, the exception to the no probable cause requirement in the case of an official retaliatory policy is not applicable here (see Lozman v City of Riviera Beach, 585 US &mdash, &mdash, 138 S Ct 1945, 1952 [2018]). This exception was applied in the retaliatory arrest (not prosecution) context and should be limited to that context (see id. at 1953-1955; O'Boyle v Commerce Group, Inc., 2023 WL 2579134, *5, 2023 US App LEXIS 6665, *14-15 [11th Cir Mar. 21, 2023, No. 22-10865]). The [*5]NRA's allegations were, at any rate, insufficient to raise an inference that the state officials outside the NYAG's office who are alleged to have had animus toward the NRA had any role in the decision to investigate or bring an enforcement action against it.
The NRA also asserts two counterclaims based on the NYAG's alleged selective enforcement of the charities laws. These counterclaims were properly dismissed for failure to sufficiently allege differential treatment of similarly situated charities (see generally Matter of 303 W. 42nd St. Corp. v Klein, 46 NY2d 686, 693 [1979]). Although the NYAG routinely exercises its power to enforce the charities laws, and it is statutorily authorized to seek dissolution of a charity where, as here, there are allegations of persistent fraud or illegality (see N-PCL 1101[a][2]), the NRA argues that the NYAG has not otherwise sought dissolution of charities even with similar allegations of executive misconduct. However, the NRA has not pleaded facts showing that these charities were similarly situated. Unlike the NRA, which has retained many of the executives against whom malfeasance is alleged in prominent leadership positions, the other investigated charities where dissolution was not sought agreed to overhaul their leadership (see Matter of Karakash v Del Valle, 194 AD3d 54, 66-67 [1st Dept 2021]). Further, though it is not common, this is not the sole case in which the NYAG has sought dissolution (see id. at 67). Indeed, "the Attorney-General, and the courts, have a considerable amount of discretion in determining whether dissolution is warranted" (People v Oliver Schools, 206 AD2d 143, 147-148 [4th Dept 1994]), and the court may exercise that discretion (as here) to decline to award dissolution even if authorized (see N-PCL 1109).
Turning to the NRA's appeal of two discovery orders, the court's holdings in these orders, which concerned the Aronson documents [FN3] and Frenkel Report,[FN4]
were proper. The Aronson documents are not protected by either the work product or trial preparation privileges because they were not prepared in anticipation of litigation (see generally CPLR 3101[c], [d][2]; MBIA Ins. Corp. v Countrywide Home Loans, Inc., 93 AD3d 574, 574 [1st Dept 2012]; Coastal Oil N.Y. v Peck, 184 AD2d 241, 241 [1st Dept 1992]). Even if some of the advice reflected in these documents is responsive to the NYAG's allegations in this proceeding or to litigation matters generally, the filings that were the subject of the advice are required to be made, and amended as appropriate, in the ordinary course of business (see Executive Law §§ 172[1], 172-d[1]; 13 NYCRR 91.5[c]).
As we have granted the NRA's motion to supplement the record to include copies of the Aronson documents, the NYAG's arguments regarding the NRA's failure to sufficiently identify or describe these documents are moot. Because we find that these documents are not privileged, we need not reach the parties' arguments regarding waiver or substantial [*6]need and undue hardship.
The NRA waived its privilege-based objections to production of the Frenkel Reportby failing to raise them in opposition to the NYAG's prior motion to compel. Although the NRA purported to reserve its rights to object "on other grounds, including privileges," this vague, unilateral assertion was not sufficient to prevent waiver. In any event, the NRA's privilege claims are unavailing.
The attorney-client privilege was waived by disclosure to the NRA's outside auditor (see Ambac Assur. Corp. v Countrywide Home Loans, Inc., 27 NY3d 616, 624 [2016]; Vacco v Harrah's Operating Co., 2008 WL 4793719, *5, 2008 US Dist LEXIS 88158, *15 [ND NY, Oct. 29, 2008, No. 1:07-CV-o663 (TJM/DEP)]). While the auditor may have been an agent of the NRA, giving rise to a reasonable expectation of confidentiality, its presence was not necessary to enable the attorney-client communication; indeed, the Frenkel Report was shared with the auditor after the fact to enable its own separate audit (see Ambac, 27 NY3d at 624).
The work product privilege does not apply to the Frenkel Report because it was not prepared in anticipation of litigation (see Mahoney v Staffa, 184 AD2d 886, 887 [3d Dept 1992], lv dismissed 80 NY2d 972 [1992]). In light of our finding that this privilege does not apply, we need not reach the parties' arguments regarding its waiver.
All Concur.
Accordingly, the order of the Supreme Court, New York County
(Joel M. Cohen, J.), entered June 10, 2022, which granted the NYAG's motion to dismiss defendant NRA'S First Amendment retaliation and selective enforcement counterclaims, should be affirmed, without costs. The order, same court and Justice, entered on or about October 3, 2022, which denied the NRA's motion to review the Special Master's Second Amendment Order regarding the Aronson documents, should be affirmed, without costs. The order, same court and Justice, entered November 30, 2022, which denied the NRA's motion to review and reverse the Special Master's order mandating production of the Frenkel Report, should be affirmed, without costs.
Order, Supreme Court, New York County (Joel M. Cohen, J.), entered June 10, 2022, affirmed, without costs. Order, same court and Justice, entered on or about October 3, 2022, which denied the NRA's motion to review the Special Master's Second Amendment Order regarding the Aronson documents, unanimously affirmed, without costs. Order, same court and Justice, entered November 30, 2022, which denied the NRA's motion to review and reverse the Special Master's order mandating production of the Frenkel Report, unanimously affirmed, without costs.
Opinion by Scarpulla, J. All concur.
M-4068 —People of the State of New York v The National
Rifle Association of America
Motion to supplement the record on appeal to include copies of the Aronson documents, granted.
Manzanet, J.P., Oing, Scarpulla, Rodriguez, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF [*7]THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: December 28, 2023

Footnotes

Footnote 1:The dissolution claims were dismissed in People v National Rifle Assn. of Am., Inc., 74 Misc 3d 998 (Sup Ct, NY County 2022).

Footnote 2:Attorney General James's campaign rhetoric was protected by the First Amendment (see McCutcheon v Federal Election Commn., 572 US 185, 191 [2014] [noting that the First Amendment "surely protects" campaign speech]). Assuming, arguendo, that Attorney General James had personal animus toward the NRA, that would still be insufficient to demonstrate causation on the claim for retaliation given the abundant evidence cited above that the NYAG's investigation was supported by probable cause.

Footnote 3: Following commencement of this action, the NRA engaged accounting firm Aronson LLC to audit its 2019 and 2020 financial statements and assist in preparing its 2019 and 2020 federal and state tax returns. In response to the NYAG's subpoena, Aronson produced 18,000 pages of documents but, at the instruction of the NRA, withheld or redacted certain documents deemed privileged.

Footnote 4:The Frenkel Report is an internal investigation report by Jacob S. Frenkel, the NRA's outside counsel, which set forth findings and recommendations pertaining to certain transactions that were charged to an NRA corporate credit card.